**Entered on Docket**
**April 24, 2007**

_Bruce A. Markell_
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: | ) |
| | ) BK-S-03-17306-BAM |
| NATIONAL AUDIT DEFENSE NETWORK, | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| _____ | ) |
| WILLIAM A. LEONARD, JR., Chapter 7 | ) |
| Trustee | ) Adv. Proceeding No.: 04-1221-BAM |
| | ) _**(Lead)**_ |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WESTON J. COOLIDGE; WJC | ) |
| ENTERPRISES, INC.; BRIDGEWAY CORP.; | ) |
| and PACIFIC NORTHWEST, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| WILLIAM A. LEONARD, JR., Chapter 7 | ) _Consolidated With:_ |
| Trustee, | ) |
| | ) Adv. Proceeding No.: 05-1151-BAM |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WESTON J. COOLIDGE; WJC | ) |
| ENTERPRISES, INC.; BRIDGEWAY CORP.; | ) |
| and PACIFIC NORTHWEST, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| | ) |
| | ) |
| | ) |

| | |
|---|---|
| WILLIAM A. LEONARD, JR., Chapter 7 Trustee<br><br>Plaintiff,<br><br>vs.<br><br>ALAN RODRIGUEZ, also known as ALAN RODRIGUES; ALAN II, INC.; R and R FINANCIAL, INC.; DIAMOND MARKETING, LTD.; M.J. SALES, INC.; and ELITE SOLUTIONS USA, INC.,<br><br>Defendants. | *Consolidated With:*<br><br>Adv. Proceeding No.: 04-1230-BAM |
| WILLIAM A. LEONARD, JR., Chapter 7 Trustee,<br><br>Plaintiff,<br><br>vs.<br><br>ALAN RODRIGUEZ, also known as ALAN RODRIGUES; ALAN II, INC.; R and R FINANCIAL INC.; DIAMOND MARKETING, LTD.; M.J. SALES, INC.; and ELITE SOLUTIONS USA, INC.,<br><br>Defendants. | *Consolidated With:*<br><br>Adv. Proceeding No.: 05-1152-BAM<br><br><br>Date:    September 19, 2006<br>Time:   9:30 a.m. |

## OPINION AFTER TRIAL

National Audit Defense Network ("NADN" or "debtor") engaged in the selling of tax shelters and other products designed to take advantage of people's disdain for paying taxes.  Its products were close to worthless, leading ultimately not only to this bankruptcy on June 11, 2003,[1] but to a permanent injunction against NADN's further dissemination of tax-avoidance schemes and against its activities as a federal income tax return preparer.  NADN's bankruptcy also left thousands of its

---

[1]NADN's case started out as one under chapter 11.  On May 27, 2004, the case was converted to one under chapter 7, and the plaintiff William Leonard was appointed as the chapter 7 trustee.

customers with unsupported and unsupportable tax positions.

At trial, the plaintiff in this action, William Leonard ("Trustee") established that, at the times relevant to this action, defendant Weston Coolidge ("Coolidge") was NADN's chairman and president, and that defendant Alan Rodrigues ("Rodrigues")[2] was NADN's executive vice president and general manager.  The Trustee  also produced evidence that Coolidge operated NADN through his own actions, and through his manipulation of Bridgeway Corporation ("Bridgeway"), WJC Enterprises, Inc. ("WJC") and Pacific Northwest, Inc. ("PNI"), and that Rodrigues operated NADN through his own actions and through his manipulations of Alan II, Inc. ("Alan II"), R and R Financial, Inc. ("RR"), Diamond Marketing, Ltd. ("Diamond"), M.J. Sales, Inc. ("MJ"), and Elite Solutions USA, Inc. ("Elite").[3]  Bridgeway, WJC and PNI are also defendants in this action, and are collectively referred to as the "Coolidge Defendants"; Alan II, RR, Diamond, MJ and Elite are also defendants in this action, and are collectively referred to as the "Rodrigues Defendants."[4]

The Trustee seeks to avoid $1,046,585 in transfers from NADN to Coolidge and the Coolidge Defendants, and to avoid $3,718,192.39 in similar transfers to Rodrigues and the Rodrigues Defendants.  The Trustee seeks to avoid the transfers on essentially four types of claims for relief: as actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and NEV. REV. STAT. § 112.180.1;[5] as

---

[2]Rodrigues' name is sometimes spelled "Rodriguez," but no claim has been made of mistaken identity.

[3]Coolidge and Rodrigues were not alone is their management of NADN.  Other members of NADN's management team, however, are either dead, defendants in other adversary proceedings, or debtors in their own bankruptcies.

[4]The Trustee initiated four separate adversary proceedings against various combinations of the defendants.  Before trial, the court consolidated all actions with the consent of all the parties.

[5]The Trustee has standing to bring the state law cause of action under 11 U.S.C. § 544(b); at all times relevant, the Internal Revenue Service held "an unsecured claim that is allowable under section 502 of this title or that is not allowable only under Section 502(e) of this title," and the Internal Revenue Service could have used the provisions of chapter 112 of the Nevada Revised Statutes to set aside the transfers.  11 U.S.C. § (continued...)

constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) and NEV. REV. STAT. § 112.190.1; as preferences under 11 U.S.C. § 547; and as unauthorized post-petition transfers under 11 U.S.C. § 549.  The Trustee also seeks to hold Coolidge and Rodrigues liable for the debts of the Coolidge Defendants and the Rodrigues Defendants, respectively, and vice versa.  In short, the Trustee seeks to pierce the corporate veil of each of the Coolidge Defendants and the Rodrigues Defendants, and to hold Coolidge and Rodrigues responsible for the debts of, respectively, the Coolidge Defendants and the Rodrigues Defendants.

The Trustee essentially alleged that the defendants knowingly participated in a wide-ranging scheme which used NADN to extract money from NADN's customers for the ultimate benefit of Coolidge and Rodrigues, among others.  This action seeks to recover for the estate the transfers the defendants used to enrich themselves at creditors' expense.[6]  Although a full trial was held in this matter, neither Coolidge nor Rodrigues testified, having elected early on to invoke the Fifth Amendment with respect to any question asked of them that related to NADN, the Coolidge Defendants, or the Rodrigues Defendants.  As a result, trial was conducted according to this district's alternate direct testimony rule, under which the plaintiff submits its direct testimony by declaration,

---

[5](...continued)
544(b)(1).  Chapter 112 codified the Uniform Fraudulent Transfer Act ("UFTA") in Nevada.  Nev. Rev. Stat. § 112.140.  Nevada has also adopted the UFTA provision regarding uniformity of construction among the states that have adopted it, and thus this opinion refers to state law decisions from other states which have also adopted the UFTA as authority for its conclusions of law.  Id. § 112.250 ("This chapter must be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it.")

Given the status of the Internal Revenue Service as a creditor, the Trustee could also have sought to set aside the transfers under 28 U.S.C. § 3301, *et. seq.*, which permits avoidance of a transfer fraudulent against the United States for up to six years, *id.* at § 3306(b)(1).  The Trustee, however, elected not to pursue that cause of action.

[6]In addition to traditional creditors, many of NADN's customers are also creditors – NADN issued "money-back" guaranties for their work which the customers claim were never honored.

4

and then makes the declarants available for cross-examination.  NEV. LOCAL BANKR. RULE 9017.[7]
After two days of trial and argument under this procedure, the parties submitted the matter, subject to
post-trial briefing.

The court finds that the Trustee has met his burden of showing that all of these transfers,
regardless of whether they were made pre- or postpetition,[8] were fraudulent transfers made by NADN
with the actual intent to hinder, delay or defraud creditors, and that no defendant has any viable
defense.  The court also finds that the Rodrigues Defendants were essential instrumentalities of that
fraud, and thus Rodrigues and the Rodrigues Defendants are jointly and severally liable for all claims
against each other; it makes the similar finding for Coolidge and the Coolidge Defendants.  Given
these findings, there is no need to further assess whether a smaller subset of the transfers were also
avoidable as preferences or as constructively fraudulent transfers.

**I.        Summary of Trustee's Evidence**

The Trustee introduced four declarations: one from a forensic accountant; one from
NADN's former controller who had worked with the defendants both pre- and postpetition; one from
a personal property appraiser; and one from the Trustee himself.[9]  Collectively, these declarations paint
a grim picture of an enterprise run primarily to bilk gullible taxpayers out of their hard-earned money.

---

[7]At the beginning of trial, counsel for the defendants objected to the introduction of the Trustee's
declarations, alleging that he had not had the ten business days to review them granted him under the local rules.
NEV. LOCAL BANKR. RULE 9017(d)(1).  After reviewing the dealings between the parties, the court concluded
that counsel for the defendant either failed to properly object (the first such objection being made at the start
of the trial) or waived the right to object, in that the Trustee placed the documents on a website used to exchange
evidence within the time extensions granted between the parties.

[8]For the treatment of postpetition fraudulent transfers under Section 549, see note 12, *infra*.

[9]Various documents were also admitted through these declarations.  For example, the Trustee attached
to his declaration the various consent decrees that Coolidge, Rodrigues and others entered into with respect to
actions brought by the United States.  In particular, these documents revealed that, among other things, the
parties agreed that, from the date of the consent decrees, they would: not act as federal-income-tax-return
preparers; not organize or sell abusive tax shelters; and not promote any false or fraudulent tax scheme.

Although technically not a Ponzi scheme, the declarations present a picture of a business designed to maximize sales of dodgy tax products through high-pressure sales tactics and overblown advertising, all to the benefit of the defendants.

In addition, the Trustee adduced credible evidence that Coolidge and Rodrigues were officers and managers of NADN and could control a significant array of NADN activities.  He also introduced  evidence tending to indicate that each had significant experience in tax or accounting matters.  From this, the Trustee argued that the human defendants, as insiders of the business, knew, or should have known, that most – if not all – of the advice NADN sold was bogus or unlawful.

With respect to the nature and character of NADN's business, Dana Basney, the Trustee's forensic accountant, testified as follows:

> My review of NADN's operations reveals that NADN ran a tax-scam boiler room that sold three primary products: (a) bogus home-based businesses; (b) a phony website-modification plan called "Shopn2000" that falsely claim[ed] an American with Disabilities Act related tax credit; and (c) worthless incorporation services.
>
> . . . It is my opinion that NADN's tax scams could be compared with a "Ponzi" scheme: NADN offered unrealistic tax saving[s] to customers, which its representatives knew could never be delivered as promised. . . . Although not a classic Ponzi scheme in the sense that new money was the source of paying earnings on prior money, NADN had many characteristics of a Ponzi scheme.  NADN utilized customer payments to fund extensive advertising services to attract new customers for its tax products and services. . . . NADN spent most of this money for an increased telemarketing presence and never provided adequate resources to do the tax return work it had promised

1   customers . . .

2        . . . In my opinion, NADN was able to survive for the period 2001 to its

3   demise because it took the majority of its receipts on the premise that it would

4   perform future services which were never performed.  The receipts for future

5   services were then utilized for sales and boiler-room operations.  The resources

6   needed to perform the future services required of the company were never set

7   aside or adequately funded.  NADN, in my opinion, was a boiler room fraud

8   scheme; it was not a legitimate accounting firm for the years which I

9   reviewed. . . . NADN masked the nature of its operations and represented itself

10  to be a solvent company through the use of improper revenue-recognition

11  procedures, which were not in accordance with Generally Accepted Accounting

12  Principles.

13  Declaration of Dana A. Basney, ¶¶ 19-22.  Mr. Basney also testified that up to two-thirds of NADN's

14  staff were salesmen and saleswomen, and that only 3% of the staff were directly involved in tax return

15  preparation.  *Id.* ¶ 21.

16        Mr. Basney also opined that NADN was insolvent during all relevant periods.  In particular,

17  he found that NADN had a negative stockholder equity of approximately $4.7 million in January 2001,

18  and a negative stockholder equity of approximately $8.3 million in May 2004.  To arrive at his

19  conclusion, Mr. Basney had to significantly revise NADN's financial reports, as they had shown a

20  positive net worth at all relevant times, ranging from a low of approximately $800,000 on January 31,

21  2001, to a high of over $1.8 million by May 2004.

22        What accounts for these massive differences?  Many things, none of which are particularly

23  savory.  The chief subterfuge, however, was a standard ingredient in the traditional recipe for cooked

24  books: NADN took long-term revenue and booked it as short-term income.  More particularly, it sold

25

7

memberships and other packages that related to the long-term provision of services, but booked all of that revenue as income in the year in which received, instead of deferring a portion of it (thereby creating an offsetting liability for services) over the life of the receivable. By way of example, if a customer paid NADN for a five-year membership, NADN recorded all of that income in the year in which the customer paid. Proper accounting procedures, however, would have required NADN to spread that income over the five-year period, and to reflect the liability for unearned services as well. *See, e.g.*, SECURITIES & EXCHANGE COMM'N, STAFF ACCOUNTING BULLETIN 104 (2003), which Mr. Basney relied upon. By engaging in this practice, NADN artificially inflated its current earnings, and understated its long-term liabilities. Mr. Basney estimated that NADN overstated its earnings by as much as $3.5 million to $5 million a year during the period of 2001 to 2004.

The Trustee also introduced a motley of evidence showing that Coolidge owned or controlled each of the Coolidge Defendants, and that Rodrigues owned or controlled each of the Rodrigues Defendants. This evidence consisted of printouts of webpages from the Nevada Secretary of State and the testimony of Ms. Minchey, NADN's former controller. Ms. Minchey testified that she observed Coolidge and Rodrigues directing isolated activities related to various Coolidge Defendants and Rodrigues Defendants, and that she was not aware of anyone else associated with these defendants. Also introduced were the depositions of Coolidge and Rodrigues, to which were attached copies of notes signed by NADN in favor of either Coolidge or Rodrigues, or one of their wholly-owned companies, and an agency agreement between NADN and Alan II. Ms. Minchey testified on cross-examination that payments on these notes and agreements were at the direction of either Coolidge or Rodrigues, and not according to any particular payment schedule.

8

**II.**          **Summary of Defendants' Evidence: The Effect of Invoking the Fifth Amendment**

At their depositions, Coolidge and Rodrigues refused to testify, each invoking their privilege against self-incrimination.  This privilege is contained in the Fifth Amendment to the United States Constitution, which states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. CONST., AMEND V.  Notwithstanding its plain language, the Supreme Court has extended the Fifth Amendment's protections to civil proceedings. *See* Lefkowitz v. Turley, 414 U.S. 70, 77 (1973).

Although civil litigants such as Coolidge and Rodrigues may invoke the Fifth Amendment, the trier of fact is equally free to draw adverse inferences from their failure of proof.  *See* Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); S.E.C. v. Colello, 139 F.3d 674, 677-78 (9th Cir. 1998); United States v. Solano-Godines, 120 F.3d 957, 962 (9th Cir. 1997) ("In civil proceedings, however, the Fifth Amendment does not forbid fact finders from drawing adverse inferences against a party who refuses to testify.").

Indeed, a court is empowered to do more than simply draw adverse inferences; in appropriate cases it may strike pleadings, bar evidence and even rule against a party based upon that party's refusal to testify. *See, e.g*., Wehling v. Columbia Broadcasting System, 608 F.2d 1084, 1089 (5th Cir. 1979) (when invocation of privilege prejudices the other party, trial court "would be free to fashion whatever remedy is required to prevent unfairness."); Parsons v. United States, 360 F.Supp. 2d 1083 (E.D. Cal. 2004) (civil litigant's declaration offered in opposition to summary judgment motion stricken when declarant had previously invoked Fifth Amendment in deposition on same subject, even when declarant offered to be deposed again on the narrow subject set forth in the declaration); United States v. One Parcel of Real Property, 780 F.Supp. 715, 722 (D. Or. 1991) (striking counterclaim and affirmative defense in their entirety because of defendant's use of the privilege); S.E.C. v. Benson, 657 F.Supp. 1122, 1129 (S.D.N.Y. 1987) (granting summary judgment

9

1    against the silent party).

2    The ability to draw adverse inferences, however, is not unfettered.  Lower courts have been

3    uniform in suggesting that the key to interpreting *Baxter* is that:

4    adverse inference[s] can only be drawn when independent evidence exists of

5    the fact to which the party refuses to answer.  *See, e.g.*, LaSalle Bank Lake

6    View v. Seguban, 54 F.3d 387, 391 (7th Cir. 1995); Peiffer v. Lebanon Sch.

7    Dist., 848 F.2d 44, 46 (3d Cir. 1988). Thus, an adverse inference can be drawn

8    when silence is countered by *independent evidence* of the fact being questioned,

9    but that same inference cannot be drawn when, for example, silence is the

10    answer to an allegation contained in a complaint. *See* Nat'l Acceptance Co. v.

11    Bathalter, 705 F.2d 924, 930 (7th Cir. 1983). In such instances, when there is

12    no corroborating evidence to support the fact under inquiry, the proponent of

13    the fact must come forward with evidence to support the allegation, otherwise

14    no negative inference will be permitted. *See LaSalle Bank*, 54 F.3d at 391.

15    Doe *ex rel*. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1264 (9th Cir. 2000) (emphasis in original).

16    As a result of these cases, the practice has evolved that the only sure way to assert the

17    privilege is on a question-by-question basis.  As a result,  the party has to decide with respect to each

18    question asked whether to invoke his or her Fifth Amendment right. *See Glanzer*, 232 F.3d at 1263;

19    United States v. Bodwell, 66 F.3d 1000, 1001 (9th Cir. 1995); Jackson v. Microsoft Corp., 211 F.R.D.

20    423, 433 (W.D. Wash. 2002).

21    In this case, Coolidge and Rodrigues invoked their Fifth Amendment privilege during their

22    depositions.  The Trustee then brought a motion in limine to exclude each of them from testifying

23

24

25
                                    10

1  during trial.  Despite the lack of any opposition, the court only partially granted the Trustee's motion.[10]

2  Regardless, Coolidge and Rodrigues did not testify, nor did they employ any court process, such as

3  a subpoena, to compel the production of any documentary evidence in their favor.  Thus, not only does

4  the court draw an adverse inference against the defendants because of their invocation of the Fifth

5  Amendment, but it also draws a negative inference from Coolidge's and Rodrigues' failure to produce

6  any documentary information in their defense, and from the failure of the Coolidge Defendants and

7  the Rodrigues Defendants to introduce any evidence at all.  *See, e.g.,* Evans v. Robbins, 897 F.2d 966,

8  970 (8th Cir. 1990) ("[I]n certain circumstances, a negative inference arises from a defendant's failure

9  to produce documents shown to have been in his possession.  The inference is that the documents

10  would have been damaging to the defendant.  This adverse inference rule is applicable when the

11  following factors are present:  (1) it appears that the documentary evidence exists or existed; (2) the

12  suppressing party has possession or control of the evidence; (3) the evidence is available to the

13  suppressing party, but not to the party seeking production; (4) it appears that there has been actual

14  suppression or withholding of evidence.") (citations omitted); Commercial Ins. Co. of Newark, New

15

16  [10]The transcript of the ruling was as follows:

17          THE COURT: Well, let's deal with the motion in limine first because, actually, I have
       some questions with respect to the pretrial or the conduct of the trial.

18          MR. JACKA: Okay.
           THE COURT: I've read the motion. Mr. Clark, I haven't seen any opposition.

19          MR. CLARK: I didn't --
           THE COURT: Did you file it?

20          MR. CLARK: I didn't file any opposition, your Honor. I couldn't. I couldn't. My
       research didn't reveal to me that I could.

21          THE COURT: Okay. And what I am prepared to do, then, is I'll grant the motion in
       limine to the following extent.  And that is neither Mr. Rodriguez [*sic*] or Mr. Coolidge will

22     be allowed to testify as to any matters as to which they invoked the Fifth Amendment in the
       earlier depositions and/or 2004 examinations. If there is any purported -- I'm not going to bar

23     them completely. If there's any testimony which they wish to give, it will be their burden to
       show that it was not a question properly within the scope of the questions which were posed

24     or which could have been posed in the normal course of events when they invoked the Fifth
       Amendment in each of their prior examinations. . . .

25
                                                    11

1   Jersey v. Gonzalez, 512 F.2d 1307, 1314 (1st Cir. 1975) ("It is elementary that if a party has evidence,

2   here, allegedly, a document, in its control and fails to produce it, an inference may be warranted that

3   the document would have been unfavorable."); Jones v. Otis Elevator Co., 861 F.2d 655, 658-59 (11th

4   Cir. 1988) ("'[I]f a party has it peculiarly within his power to produce witnesses whose testimony

5   would elucidate the transaction, the fact that he does not do it creates the presumption that the

6   testimony, if produced, would be unfavorable.'"), *quoting* Graves v. United States, 150 U.S. 118, 121

7   (1893); *see also* NEV. REV. STAT. § 47.250.1, .3 &.4 (under Nevada law, court may presume that "an

8   unlawful act was done with an unlawful intent," that "evidence willfully suppressed would be adverse

9   if produced," and that "higher evidence would be adverse from inferior being produced.").

10  **III.        Recoveries Under Fraudulent Transfer Provisions**

11          As indicated above, the Trustee has identified $1,046,585 in transfers from NADN to

12  Coolidge and the Coolidge Defendants that occurred between July 15, 2000 and NADN's filing, which

13  he contends may be avoided as fraudulent transfers.  During the same period, the Trustee has identified

14  $3,718,192.39 in similar transfers to Rodrigues and the Rodrigues Defendants.[11]  Among other things,

15  the Trustee prosecuted his case on the theory that each of these transfers were made with the "actual

16  intent to hinder, delay or defraud" creditors under both state and federal law.   11 U.S.C. §

17  548(a)(1)(A); NEV. REV. STAT. § 112.180.1(a).[12]

18  _____

19          [11]The court takes this amount from the Trustee's post-trial brief, which contains a summary of the
    evidence the Trustee adduced at trial.  The court has independently reviewed the documents the Trustee cites

20  as supporting these totals and concurs that they constitute an accurate total.

21          [12]Of the total transfers attacked as fraudulent transfers, some were made postpetition.  All told, the
    Trustee identified $184,811.29 in postpetition transfers from NADN to Coolidge and the Coolidge Defendants,

22  and $373,107.23 in postpetition transfers from NADN to Rodrigues and the Rodrigues Defendants.  Federal
    fraudulent transfer laws are not directly applicable to these transfers, however, as Section 548 only covers

23  transfers occurring before the petition date.
            Postpetition transfers, however, are vulnerable under 11 U.S.C. § 549(a).  Under that provision, a trustee

24  may recover a postpetition transfer of estate property if that transfer is not authorized under title 11 or by the
                                                                                            (continued...)

25

1      A.      *The Basic Requirements: Transfers of Property in Which the Debtor Had an*

2              *Interest Made Within the Applicable Reachback Period*

3              To prevail on his claims of fraudulent transfers made with the actual intent to hinder, delay

4      or defraud creditors, the Trustee must show that:

5              (1) NADN transferred an interest in property to the defendants; and

6              (2) NADN transferred the property during the applicable reachback period — one year

7              prior to the petition under 11 U.S.C. § 548,[13] and four years after the transfer for Nevada's

8              version of the Uniform Fraudulent Transfer Act ("UFTA");  and

9              (3) NADN made the transfer with actual intent to hinder, delay, or defraud a present or

10             future creditor.

11     11 U.S.C. § 548(a)(1)(A); NEV. REV. STAT. § 112.180.1(a).  Pioneer Liquidating Corp. v. San Diego

12     Trust & Sav. Bank (*In re* Consolidated Pioneer Mortg. Entities), 211 B.R. 704, 809-10 (S.D. Cal.

13     1997), *aff'd in part, rev'd in part, In re* Consolidated Pioneer Mortg. Entities, 166 F.3d 342 (9th Cir.

14     1999) (mem.).

---

16     [12](...continued)

       court.  As an initial matter, the Trustee has established the first requirement: that the postpetition transfers were

17     made with property of NADN's estate.  He has shown that the transfers consisted of cash, bank credits or wire
       transfers originating from NADN accounts.

18              To the extent the Trustee demonstrates a postpetition transfer was made with the intent to hinder, delay
       or defraud creditors as contemplated in Section 548(a)(1)(A) of the Bankruptcy Code or NEV. REV. STAT. §

19     112.180.1(a), the Trustee has demonstrated the second requirement: a lack of required authorization.  Title 11
       does not authorize intentional fraudulent transfers (to argue that they were authorized because they were made

20     in the ordinary course of NADN's tax scam business is to lose sight of the larger purpose of authorization).  It
       is also without cavil that this court (or any other court, for that matter) never approved a transfer that was to be

21     made with the intent to hinder, delay or defraud creditors.  Without the required authorization, the transfer
       would be avoidable.  11 U.S.C. § 549(a)(2).  This opinion thus proceeds on the assumption that, *ceterus paribus*,

22     an intentionally fraudulent transfer made postpetition by NADN is avoidable.

23              [13]This case was filed before Congress amended Section 548 to extend the general reachback period to
       two years.  Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, §

24     1406(b)(2), 119 Stat. 23, 216 (2005) (making two year reachback period effective for all cases filed after April
       20, 2006).

25

The Trustee has met the first two requirements.  He seeks recoveries based on funds transferred by checks drawn on NADN accounts or wire transfers of funds from NADN accounts.  In short, he has shown that money that was NADN's passed from NADN to the defendants.[14]  In addition, through his declarations, the Trustee established the date of transfer for each check or wire transfer. None of the transfers identified were more than four years previous to the petition date.[15]

*B.    Fraudulent Intent*

Actual fraudulent intent is an issue of fact.  5 COLLIER ON BANKRUPTCY ¶ 548.04[1] (15th rev. ed. 2007) ("The approach under section 548(a)(1)(A) is purely factual"); Mazer v. Jones (*In re Jones*), 184 B.R. 377, 385 (Bankr. D.N.M. 1995); Bradford v. Bradford, 993 P.2d 887, 891-92 (Utah Ct. App. 1999), *cert. denied sub. nom.* Bradford v. Demita, 4 P.3d 1289 (Utah 2000) (mem.). Traditionally, the intent required for actual fraudulent transfers is established by circumstantial evidence, since it will be the rare case in which the debtor testifies under oath that he or she intended to defraud creditors.[16]  Dahar v. Jackson (*In re Jackson*), 318 B.R. 5, 13 (Bankr. D.N.H. 2004)

---

[14]For all postpetition periods, the funds would be those of NADN's estate, but for purposes of this opinion, the change does not make any substantive difference. *See* note 12 *supra*.  In addition, Rodrigues' claim that he was merely a conduit for "SPIF payments" does not deny the existence of a transfer; rather, it is a claim that Rodrigues was not a transferee of those transfers.  This opinion addresses Rodrigues' conduit claim in Part III.C. below.

[15]Although Nevada's version of the UFTA extinguishes the right to recover unless a lawsuit is commenced "within 4 years after the transfer was made," NEV. REV. STAT. § 112.230.1, Section 546(a) of the Bankruptcy Code preserves to a trustee any viable right existing on the petition date for up to two years after the filing of the petition. 11 U.S.C. § 546(a).  Accordingly, since all of these consolidated causes of action were filed within two years of the petition date (the latest of the consolidated cases being filed on June 9, 2005), the Trustee could reach transfers that state law had not "extinguished" as of the petition date. Sears Petroleum & Transport Corp. v. Burgess Constr. Servs., Inc., 417 F. Supp. 2d 212, 224-25 (D. Mass. 2006).  This means that the Trustee may seek to avoid transfers made during the four years preceding the petition date. *Id.*  As the petition date was June 11, 2003, the Trustee may seek to avoid all transfers that occurred on or after June 11, 1999.

[16]An interesting point not raised by the parties is whether the Trustee, as representative of the estate,
(continued...)

14

1   ("Absent a rare admission or declaration against interest by the defendant, a plaintiff is unlikely to

2   discover any direct proof of bad motives because often only the defendant knows his own motivation

3   at the time of the transfer."); *Mazer*, 184 B.R. at 385 ("The intent required to establish actual fraud

4   may be established by circumstantial evidence, or by inferences drawn from a course of conduct.").

5          In this regard, courts have developed "badges of fraud" – that is, recurring actions that

6   historically have been associated with the actual intent to hinder, delay or defraud creditors.  *See*

7   Twyne's Case, 3 Coke 80b, 76 Eng. Rep. 809 (Star Chamber 1601) (developing early list of badges

8   of fraud).  *See also* Cuthill v. Greenmark, LLC (*In re* World Vision Entm't, Inc.), 275 B.R. 641, 656

9   (Bankr. M.D. Fla. 2002); Indianapolis Indiana Aamco Dealers Advertising Pool v. Anderson, 746

10  N.E.2d 383, 390 (Ind. App. Ct. 2001).

11         Nevada's version of the UFTA identifies eleven such badges, with the understanding that

12  such a list is non-exclusive.  NEV. REV. STAT. § 112.180.2(a)-(k) (adopting UFTA, § 4(b) (1)-(11)).

13  These badges are:

14         (1) the transfer or obligation was to an insider;

15         (2) the debtor retained possession or control of the property transferred after the transfer;

16         (3) the transfer or obligation was disclosed or concealed;

17         (4) before the transfer was made or obligation was incurred, the debtor had been sued or

18         threatened with suit;

19         (5) the transfer was of substantially all the debtor's assets;

20         (6) the debtor absconded;

21         (7) the debtor removed or concealed assets;

22

23         [16](...continued)

24  has the power to establish conclusively the debtor's prepetition intent by testimony postpetition, in much the
    same way as a trustee can authenticate prepetition documents in any postpetition proceeding.

25
                                                  15

1    (8) the value of the consideration received by the debtor was reasonably equivalent to the

2    value of the asset transferred or the amount of the obligation incurred;

3    (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the

4    obligation was incurred;

5    (10) the transfer occurred shortly before or shortly after a substantial debt was incurred;

6    and

7    (11) the debtor transferred the essential assets of the business to a lienor who transferred

8    the assets to an insider of the debtor.

9    This list is intentionally illustrative, and not exhaustive. "Proof of the existence of any one

10   or more of the factors enumerated in subsection (b) may be relevant evidence as to the debtor's actual

11   intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a

12   fraudulent obligation." Comment (5) to UFTA, *reprinted in* 7A, pt. II, UNIF. LAWS ANN. 303 (1999).

13   Moreover, none of the badges standing alone are necessary or sufficient; the range of activities that

14   fraudsters may use to commit fraud cannot and should not be definitively cataloged. Fleming

15   Companies, Inc. v. Rich, 978 F.Supp. 1281, 1297-98 (E.D. Mo. 1997) ("Although none of the badges

16   standing alone will establish fraud, the existence of several of them will raise a presumption of fraud.")

17   (under Missouri version of UFTA); *Dahar*, 318 B.R. at 14 ("The law, therefore, allows the badges to

18   act as a substitute for direct proof of intent and permits, but does not require, the fact finder to draw

19   inferences of bad intent from them. Any badge of fraud is potentially relevant to proving fraudulent

20   intent, but no single badge alone creates a presumption of bad intent.").

21   Here, several of these traditional badges of fraud are present. The transfers were all to

22   NADN insiders,[17] were made while NADN was insolvent, and as will be seen, were mostly made

23   _____

24   [17]As officers of NADN, Coolidge and Rodrigues were both insiders. NEV. REV. STAT. § 112.140.7(b).
(continued...)

25                                                  16

1   without the receipt of value, reasonably equivalent or otherwise.  The effect of the transfers was to

2   increase the defendants' wealth at the expense of creditors' recoveries.  *See, e.g.*, Frontier Bank v.

3   Brown (*In re* Northern Merch., Inc., 371 F.3d 1056, 1059 (9th Cir. 2004) (the "primary focus of

4   Section 548 is on the net effect of the transaction on the debtor's estate and the funds available to the

5   unsecured creditors.").

6          It is key in this analysis that the required intent to hinder, delay or defraud is the debtor's;

7   no collusion with the transferee is necessary.  With a corporate transferor such as NADN, the relevant

8   intent is the intent of its officers and directors, as supplemented by the intent of the party executing

9   the transaction (signing the check; authorizing the wire transfer). "A corporation, being an entity

10   created by law, is incapable of formulating or acting with intent. Thus, for the purpose of recovering

11   impermissibly transferred corporate assets and thereby facilitating creditor recovery, the intent of the

12   officers and directors may be imputed to the corporation." Schnelling v. Crawford (*In re* James River

13   Coal Co.), 2007 Westlaw 438244, at 13 (Bankr. E.D. Va., Feb. 8, 2007).  *See also* Consove v. Cohen

14   (*In re* Roco Corp.), 701 F.2d 978, 984 (1st Cir. 1983) (imputing to corporation fraudulent intent of

15   corporate officer and sole shareholder); Friehling v. Nielson (*In re* F & C Servs., Inc.), 44 B.R. 863,

16   872 (Bankr. S.D. Fla. 1984) (noting that "where the transferee is in a position to dominate or control

17   the Debtor's disposition of his property, the transferee's intent to hinder, delay or defraud creditors

18   may be imputed to the Debtor.").

19          Here, with respect to each transfer, either Coolidge or Rodrigues personally authorized or

20   ─────────────────

21          [17](...continued)
          As the evidence showed that Coolidge and Rodrigues owned and controlled, respectively, the Coolidge

22   Defendants and the Rodrigues Defendants, the Coolidge Defendants and Rodrigues Defendants are "affiliates"
      of Coolidge and Rodrigues, *id*. § 112.150.1(b) ("Affiliate" means: [¶] . . . [a] corporation 20 percent or more

23   of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote,
      by the debtor or a person who directly or indirectly owns, controls or holds with power to vote, 20 percent or

24   more of the outstanding voting securities of the debtor . . . ."), and affiliates are also counted as insiders of
      NADN.  *Id.* § 112.150.7(d).

25                                                    17

executed the transaction (by signing the check; by authorizing the wire transfer), or authorized the transfer in the course of NADN's scheme to bilk its customers and creditors for the benefit of NADN's insiders. In either case, they acted to put investors' money out of creditors' reach by transferring it to someone other than NADN. This was all done as part of an effort to pocket personally the funds they had extracted from clients to whom NADN and its agents had given false or reckless tax advice. And to the extent that some element of fraud on NADN's clients was not technically present, it was clear that NADN took the money with the plan that it would not be given back even though a money-back guaranty had been given. This is emblematic of an effort to hinder or delay creditors from receiving their due. *See, e.g.*, COLLIER, *supra*, ¶ 548.04[1]. Given the alternative phrasing of the requisite intent – a fraudulent transfer exists if there is an intent to hinder, delay *or* defraud – such transfers are also made with the requisite intent under Section 548(a)(1) and NEV. REV. STAT. § 112.180.1(a). *See* Flushing Sav. Bank v. Parr, 81 A.D.2d 655, 656, 438 N.Y.S.2d 374, 376 (2d Dep't), *appeal dismissed*, 54 N.Y.2d 770, 443 N.Y.S.2d 61 (1981) (construing cognate language in New York's version of the Uniform Fraudulent Conveyance Act, and finding that "hinder" and "delay" are in the disjunctive and "exist independently of an intent to defraud"). As such, each of the transfers identified by the Trustee was made with the requisite intent to hinder, delay or defraud.

In addition, the manner in which the defendants ran NADN and in which they caused the transfers to be made also demonstrate the requisite intent to hinder, delay or defraud creditors. This can be seen from Mr. Basney's testimony comparing NADN to a Ponzi scheme. As noted by the Ninth Circuit's Bankruptcy Appellate Panel, "[p]roof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for purposes of actually fraudulent transfers under Bankruptcy Code § 548(a)(1)." Plotkin v. Pomona Valley Imports, Inc. (*In re* Cohen), 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996). *See also* Hayes v. Palm Seedlings Partners-A (*In re* Agric. Research & Tech. Group, Inc.), 916 F.2d 528, 535-36 (9th Cir. 1990). As further indicated by the

Ninth Circuit, "knowledge that a transaction will operate to the detriment of creditors is sufficient for actual intent." *Id.* at 535, *quoting* Coleman Am. Mov. Servs., Inc. v. The First Nat'l Bank and Trust Co. (*In re* Am. Prop., Inc.), 14 B.R. 637, 643 (Bankr. D. Kan. 1981).

While Mr. Basney correctly indicated that NADN was not a Ponzi scheme – income from new clients was not obtained to make payments to old clients – it was in many respects worse.[18] Rather than passing on the new funds to old investors, Coolidge and Rodrigues took or directed most of this money to themselves (either directly or indirectly to the Coolidge Defendants or the Rodrigues Defendants) or to the perpetuation of the scam.  And they did this at a time at which NADN was insolvent, and was becoming more insolvent with every passing day.

In essence, the defendants ran NADN for the ultimate gain of insiders by selling products they knew to be illegal or worthless.  The court infers from their positions as insiders and managers of NADN that they participated in developing NADN's business plan – a plan designed to extract money from gullible citizens under the guise of giving them legitimate and defensible tax advice.  As Mr. Basney testified, NADN did not engage in dispensing legitimate tax advice; among other things, the extremely high percentage of sales staff to tax professionals uncovered by Mr. Basney shows NADN for the farce it was.

C.    *Possible Defenses to Actual Intent Fraudulent Transfers*

As indicated above, it is irrelevant to a transferee's initial liability under Section 548(a)(1) or NEV. REV. STAT. § 112.180.1(a) that he or she was clueless as to the debtor's intent.  Such

---

[18]The term "Ponzi scheme" comes to us from Charles Ponzi, who operated a fraudulent investment scheme in the 1920s. *See* Cunningham v. Brown, 265 U.S. 1, 7-9 (1924), which discusses how Mr. Ponzi structured his scheme, and how it collapsed.

As phrased by the Ninth Circuit, "[a] Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected." *Hayes*, 916 F.2d at 531.  *See also* Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 157-58 (1998).

19

1    noncomplicity, however, factors into possible defenses, which differ depending on whether the Trustee

2    seeks avoidance under federal or state law.  Federal law avoids the entire transfer if it was made with

3    the actual intent to hinder, delay or defraud, but it does give the transferee a lien on the property

4    transferred to the extent of value given so long as the transferee took the property in good faith. 11

5    U.S.C. § 548(c).

6         By contrast, Nevada law and the UFTA both give a recipient of an actual intent fraudulent

7    transfer a complete defense the extent that he or she took  in good faith, and gave reasonably

8    equivalent value for the exchange.  NEV. REV. STAT. § 112.220.1.  By way of example, assume that

9    a debtor gave his brother his car to put the car out of the reach of the debtor's creditors, but the brother

10   did not know of the fraud or of his brother's financial condition.  Even though the brother would be

11   in good faith, both federal and state fraudulent transfer law would set the transaction aside, since no

12   value, let alone reasonably equivalent value, was given.  If the facts are changed so that the brother

13   paid $11,000 for a car worth $12,000, the treatment changes.  Under federal law, the transaction is still

14   set aside, but the brother has a lien on the car to the extent of $11,000; under state law, assuming that

15   $11,000 is reasonably equivalent value for a $12,000 car, the brother has a complete defense to

16   avoidance.  Finally, even under the last set of assumptions (brother pays $11,000 for a car worth

17   $12,000), if the brother colludes in the transfer, or otherwise does not take in good faith, both federal

18   and state law would avoid the transaction.  In short, good faith is a necessary, but not sufficient,

19   element of a transferee's defense.

20              **1.    Good Faith**

21         As can be seen from the above example, the common issue under both state and federal

22   statutes is good faith.  If good faith is absent, the differences between state and federal law do not

23   matter, and the transfers are fully avoidable.   Good faith, however, is a notoriously hard-to-define

24   concept in commercial law.  As noted in COLLIER:

25
                                                20

> The unpredictable circumstances in which the courts may find its presence or absence render any definition of "good faith" inadequate, if not unwise. Knowledge of the transferor's insolvency may, in conjunction with other factors, prevent the transferee from asserting good faith.  Indeed, the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment.

COLLIER, *supra,* ¶ 548.07[2][a].  *See also Cuthill*, 275 B.R. at  656 (good faith lacking when debtor made gratuitous transfer which recipient knew of transferor's insolvency); Hall v. World Sav. and Loan Ass'n, 189 Ariz. 495, 500, 943 P.2d 855, 861 (Ariz. App. Ct. 1997) (good faith lacking when there is some knowing participation by the transferee in a transaction that directs assets to transferees at the expense of creditor recoveries).

Although the standard for good faith is difficult to define, some courts have found standard themes regarding a lack of good faith.  The Ninth Circuit has approved, for example, the following venerable statement regarding a lack of good faith:

> while the plaintiff was not bound to act upon mere suspicion as to the intent with which [the transferor] made the sale in question, if he had knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether [the transferor] intended to delay or defraud his creditors, and he omitted to make such inquiry with reasonable diligence, he should have been deemed to have notice of such fact, and therefore such notice as would invalidate the sale to him, if such sale was in fact made with the intent upon the part of the [transferor] to delay or defraud other creditors.

21

1    Shauer v. Alterton, 151 U.S. 607, 621 (1894), *quoted with approval in Hayes*, 916 F.2d at 535.  *See*

2    *also* Jobin v. McKay (*In re* M&L Bus. Mach. Co., Inc.), 84 F.3d 1330, 1338 (10th Cir. 1996) (adopting

3    objective good faith measurement, and finding good faith lacking if circumstances would place a

4    reasonable person on inquiry of debtor's fraudulent purpose, and a diligent inquiry would have

5    discovered such purpose); Brown v. Third Nat'l Bank (*In re* Sherman), 67 F.3d 1348, 1355 (8th Cir.

6    1995) (good faith test by what transferee objectively knew or should have known, and not by

7    transferee's actual, subjective knowledge).  As summarized in *Palm Seedlings Partners*, "[t]hese

8    pronouncements indicated that courts look to what the transferee 'knew or should have known' in

9    questions of good faith, rather than examining what the transferee actually knew from a subjective

10   standpoint."  916 F.2d at 535-36.[19]

11          Under these standards, no defendant took any transfer in good faith.  With respect to

12   Coolidge and Rodrigues, they authorized or received transfers which they knew, or should have

13   known, were unlawful or unconscionably obtained.  Further, they accepted these transfers at a time

14   when they knew, or should have known, that NADN was insolvent, and at a time at which they knew,

15   or should have known, that NADN had "cooked" its books to show unearned income as earned.  In

16   short, they were active participants in a scheme to bleed NADN of any cash, to their benefit and to

17   creditors' detriment.

18          The same can be said for the Coolidge Defendants and the Rodrigues Defendants.  As

19   indicated above, the intent requirement for a non-individual is met by examining the intent of the

20   humans who were responsible for and who ran the entity.  Here, each of the Coolidge Defendants and

21   the Rodrigues Defendants were controlled by Coolidge and Rodrigues, respectively, and thus the lack

22

23          [19]This burden is especially heavy for insiders.  As noted by a Florida court, "[s]ome recipients, such as
24   insiders directly running the Ponzi scheme, obviously could not demonstrate good faith because of their
     involvement with the enterprise and their actual knowledge of the fraud."  *Cuthill*, 275 B.R. at 658.

25

1    of good faith of those individuals can be ascribed to the various entities.

2        This conclusion is buttressed by the relevant burden of proof.  In a fraudulent transfer

3    action alleging the actual intent to hinder, delay or defraud creditors, once the plaintiff has met his or

4    her burden of showing the transfer was made with the requisite intent, it is the recipient's burden to

5    prove the existence of good faith and, as applicable, value and reasonably equivalent value.  *Hayes*,

6    916 F.2d at 528-29;  Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (*In re* Bayou Group,

7    LLC), 2007 Westlaw 582530, at 6 (Bankr. S.D.N.Y., Feb. 23, 2007) ("The good faith/value defense

8    provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to

9    plead and establish facts to prove the defense."); Silverman v. Actrade Capital, Inc. (*In re* Actrade Fin.

10   Techs. Ltd.), 337 B.R. 791, 805 (S.D.N.Y. 2005); COLLIER, *supra*, ¶ 548.10, at 548-81 ("The party that

11   seeks to be established as a good faith transferee or obligee within this saving clause has the burden

12   of proof (risk of non-persuasion) thereon.").

13       Here, as noted above, neither Coolidge nor Rodrigues testified, and the evidence adduced

14   by the Trustee fairly called into question by independent evidence the good faith of both individuals

15   and the various entities they controlled.  Without any affirmative evidence of good faith, all defendants

16   have failed in their burden to demonstrate their defense, and the court finds that none of the defendants

17   were in good faith within the meaning of either 11 U.S.C. § 548(c) or NEV. REV. STAT. § 112.220.1.

18                **2.        Value, Reasonably Equivalent or Otherwise**

19       Through their attorney, Coolidge and Rodrigues argue that they gave value for at least some

20   of the transfers, and thus have defenses to the extent of value.  As shown above, however, a defense

21   is present only if there is both good faith *and* value.  Here, good faith was lacking, so value is

22   irrelevant.  *See, e.g., Hayes*, 916 F.2d at 538 (under Section 548(a)(1)(A), "the entire transfer may be

23   avoided, even if reasonably equivalent value was given, so long as the transferor actually intended to

24   hinder, delay or defraud its creditors and the transferee accepted the transfer without good faith");

25

                                                    23

Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995), *reh'g en banc denied*, 1995 U.S. App. LEXIS 17088 (7th Cir. 1995), *cert. denied sub nom*. African Enter., Inc. v. Scholes, 516 U.S. 1028 (1995) (under Illinois version of Uniform Fraudulent Transfer Act, "if fraudulent intent is proved, then . . . the defendant, unless he had no knowledge of the transferor's fraudulent intent must return the entire payment that he received rather than just the amount by which it exceeded the consideration that he gave in exchange for the payment"); United States v. McCombs, 30 F.3d 310, 328 (2d Cir. 1994) ("[W]here actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration given.") (applying the actual fraudulent conveyance provision of New York's version of the Uniform Fraudulent Conveyance Act); Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (*In re* Bayou Group, LLC), 2007 Westlaw 582530, at 4 (Bankr. S.D.N.Y., Feb. 23, 2007) ("the entirety of the transfer is avoidable whether or not the debtor received value in exchange, and the plaintiff need not allege and prove that the transfer was for less than fair value if actual intent is alleged and proved under Section 548(a)(1)(A)."); *see also* COLLIER, *supra*, ¶ 548.01[1], at 548-11 ("[I]f the transaction is fraudulent within the rules set forth in section 548, the trustee may avoid it in its entirety without any limitation on the extent of the recovery other than those imposed by § 548(c) to protect transferees and obligees in good faith.").

         As indicated above, however, the quantum of value given can be relevant to intent, and thus the court will examine the defendants' contentions regarding value. *See Hayes*, 916 F.2d at 537 ("[E]vidence pertaining to reasonably equivalent value is germane to a finding of actual intent.") With regard to value, the defendants produced notes in their favor executed by NADN. They then claimed to have given value, arguing that the transfers were payments on these notes. As a separate token of value, both Coolidge and Rodrigues assert that some of the transfers represented their salaries or wages from NADN.

         With respect to the characterization of the transfers as loan repayments, Coolidge and

24

Rodrigues produced, at their depositions, notes in the face amount of $439,500: $17,000 for Coolidge[20] and $422,500 for Rodrigues.[21]  However, neither Coolidge nor Rodrigues (or, for that matter, any of the Coolidge Defendants or the Rodrigues Defendants) produced any evidence connecting these notes to any particular transfer.  The notes produced bear no indications of any payments.  *See* NEV. REV. STAT. § 104.3501.2(b)(3) (payee on note has right to request the maker "[s]ign a receipt on the instrument for any payment made or surrender the instrument if full payment is made").

This failure to link specific transfers with alleged loan repayments is fatal, and the court will not indulge in any presumption to the contrary.  The Trustee met his burden of producing sufficient evidence upon which this court could enter a judgment when he introduced his significant and credible evidence of NADN's insolvency, and evidence, from the defendants' position as insiders, that the defendants knew or should have known of NADN's insolvency at a time at which they were claiming NADN to be solvent and safe.  At this point, the defendants could have attempted to rebut the inference of an intent to hinder, delay or defraud by showing that NADN received reasonably equivalent value for each transfer.  *Cf.* Sportsco Enterprises v. Morris, 112 Nev. 625, 632, 917 P.2d 934, 938 (Nev. 1996) (under constructively fraudulent transfer statute, "where the creditor establishes the existence of certain indicia or badges of fraud, the burden shifts to the defendant to come forward with rebuttal evidence that a transfer was not made to defraud the creditor. . . .  The defendant must show either that the debtor was solvent at the time of the transfer and not rendered insolvent thereby or that the transfer was supported by fair consideration.").   But they did nothing.

Without an accounting showing the application of the NADN transfers to existing loans –

---

[20]The note at issue was payable to WJC.

[21]Of these notes, $103,500 were originally made payable to Dolores Rodrigues, but bear a handwritten indication that they were additionally payable to "Alan Rodrigues or Alan II, Inc. or their assignees."  One note, in the amount of $3,000, was payable to Dolores Rodrigues alone.  Another note, in the amount of $4,000, was payable to Alan II, but the copy produced was not signed.

25

information clearly in the possession or control of the defendants – this court finds insufficient evidence to establish that NADN received any value, and thus no reason to alter its view that all transfers were made with the actual intent to hinder, delay or defraud creditors. Alternatively, the court infers from Coolidge's and Rodrigues' silence on this point, as they controlled the evidence of payment and application, that the payments were not made for the purpose of paying any legitimate indebtedness.

As to payments claimed to be wages or salaries, it is clear that there were very few, if any, restrictions on Coolidge's and Rodrigues' ability to cause NADN to transfer funds, and even fewer restrictions on how they characterized the purpose of the transfers. Under such circumstances, especially if the payments were made with the intent to hinder, delay or defraud creditors, it is no defense that the payments were denominated as compensation, or that they were compensation. It has long been the law that efforts expended with respect to a fraudulent business may not be kept against an action by creditors of that business. *In re* Rockaway Soda Water Mfg. Co., 226 F. 520 (E.D.N.Y. 1915) (avoiding transfer by corporate officers of corporate funds when transferee had knowledge that payment was fraudulent as to corporation's creditors even though corporate officers had used moneys transferee earlier advanced for corporate purposes); Zenox, Inc. v Bar-Land Corp. (*In re* Zenox, Inc.), 173 B.R. 46, 49-50 (Bankr. D.N.H. 1994) (transfers of land to insider in satisfaction of owed compensation could be set aside as transfers made with actual intent notwithstanding that the trustee did not contest that compensation was due).

D.    *Defense that Rodrigues was Merely a "Conduit:" Transfers of "SPIF Payments"*

Rodrigues disputes that he was the recipient of a significant amount of the transfers; put another way, he believes that he is not a transferee of some of the funds paid to him by NADN. Through his counsel, he asserted that he was merely a conduit for many of the payments; he contended that all he was doing was taking funds from NADN as its paymaster for its sales staff, and then

26

1    disbursing those funds – as so-called SPIF payments[22]– to those on the sales staff who had managed

2    to coax the most funds from NADN's unsophisticated clients.  Rodrigues contends that since he simply

3    paid the salesmen in his capacity as agent for NADN, he was not a transferee liable to the Trustee

4    under 11 U.S.C. § 550(a).

5            Rodrigues' conduit theory, however, simply does not wash.  In this circuit, the controlling

6    case for the "conduit" defense is Universal Serv. Admin. Co. v. Post-Confirmation Comm. of

7    Unsecured Creditors (*In re* Incomnet, Inc.), 463 F.3d 1064 (9th Cir. 2006).  In *Incomnet*, the debtor

8    had made several payments during the applicable reachback period to another entity responsible for

9    disbursing the payments under a governmental regulatory scheme.   This entity, Universal Services

10    Administrative Company, or USAC, contended that because it operated under rules and regulations

11    that severely limited what it could do with the payments Incomnet made, it was a mere conduit for the

12    beneficiaries of the debtor's payments.  *Id.* at 1074-75.  The court rejected this, finding that Incomnet

13    placed no restrictions on USAC's use of the funds, *id.* at 1075, and finding that by holding legal title,

14    USAC presumptively could disburse the funds in any way it saw fit.  *Id.*

15            The Ninth Circuit, in analyzing these facts, adopted a "dominion" test for establishing

16    whether one in possession of funds from a debtor is a transferee under Section 550.  This test states

17    that "'a transferee is one who . . . has "dominion over the money or other asset, the right to put the

18    money to one's own purposes."'" *Id.* at 1070, *quoting In re* Cohen, 300 F.3d 1097, 1102 (9th Cir.

19    2002), *in turn quoting* Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 893 (7th Cir.

20    1988).  As  *Incomnet* later stated, "[i]n the vast majority of cases, possessing legal title to funds will

21    equate to having dominion over them."  463 F.3d at 1073.

22            Under *Incomnet*, the test of whether a recipient of funds is a "transferee" under Section

23

24       [22]Internally and at trial, these funds were referred to as "SPIF payments," as they were made from the unofficial "Special Performance Incentive Fund," or "SPIF."

25

550(a) thus focuses on the level of dominion the transferee has over the funds.  The less dominion, the more likely it will be that the transferee was a mere conduit (and hence not a legitimate transferee liable to the estate under Section 550(a)).  As an example of a lack of control, the court singled out banks who receive currency with instructions from their customer to apply the funds to the debt of another, as an example of a lack of dominion.  *Id.* at 1074.

Here Rodrigues simply had checks made out to him.  He cashed them, and then allegedly distributed the cash to sales agents.  There was testimony that NADN's books and records were arranged so that the sales agents had to account for what they were paid, but no receipts for such payments were produced at trial.  Even if they had been produced, however, they would not have shown that Rodrigues lacked the necessary control over the funds.  They simply would have shown that there were records of the amounts that he gave to sales agents.  There was no testimony as to whether he was contractually bound to give only a specified amount to agents, that there was a formula for the amount of the payments, or whether Rodrigues had the discretion to reward whatever level of sales activity he saw fit.  In short, the evidence was that Rodrigues had the power and discretion to take whatever levels of money he wanted from the company, and to pay it (or not) to the sales agents in whatever amounts he decided was proper.  This level of control falls far short of the limitations required by *Incomnet*, and makes Rodrigues an initial transferee of those funds that he later decided to disburse as SPIF payments.

**IV.        Alter Ego Liability**

The Trustee also seeks to hold Coolidge liable for the transfers to the Coolidge Defendants and the Coolidge Defendants liable for the transfers to Coolidge.  A similar finding is sought with respect to Rodrigues and the Rodrigues Defendants.  This requires the court to find that each of the defendants were the alter ego of the others, findings that are easily made under these facts.

A.      *Veil-Piercing: Making Coolidge Liable for the Transfers to the Coolidge*
        *Defendants and Rodrigues Liable for the Transfers to the Rodrigues Defendants*

This court has previously reviewed Nevada law regarding alter ego liability.  In AE Rest. Assocs, LLC v. Giampietro (*In re* Giampietro), 317 B.R. 841 (Bankr. D. Nev. 2004), the court stated that under Nevada case law and statutes:

> an entity is the alter ego of another if: [¶] (1) The corporation must be
> influenced and governed by the person asserted to be its alter ego. (2) There
> must be such unity of interest and ownership that one is inseparable from the
> other; and (3) The facts must be such that adherence to the fiction of separate
> entity would, under the circumstances, sanction a fraud or promote injustice.

*Id.* at 851, *quoting* Frank McCleary Cattle Co. v. Sewell, 73 Nev. 279, 282, 317 P.2d 957, 959 (Nev. 1957).   In 2001, the Nevada legislature codified this three-part analysis.  *See* NEV. REV. STAT. § 78.747 (2004).[23]

The plaintiff in an alter ego action – here, the Trustee – must show the three factors by a preponderance of the evidence.  LFC Mktg. Group, Inc. v. Loomis, 116 Nev. 896, 904, 8 P.3d 841, 846 (Nev. 2000); Paul Steelman, Ltd. v. Omni Realty Partners, 110 Nev. 1123, 1125, 885 P.2d 549, 550 (Nev. 1994).  The Trustee has met that burden.  He introduced evidence the Coolidge Defendants and the Rodrigues Defendants did nothing without the direct involvement of Coolidge or Rodrigues, respectively,[24] and that nobody but Coolidge and Rodrigues represented any of the Coolidge

---

[23]Nevada law applies to this analysis, as all of the defendants are resident, domiciled or doing business in Nevada.  Mallard Auto. Group, Ltd. v. LeClair Mgmt. Corp., 153 F. Supp. 2d 1211, 1213 (D. Nev. 2001). *See also* SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003).

[24]Attached to the deposition of Rodrigues is an "Agency Agreement" between Alan II and NADN, but the only substantive requirement the agreement imposes on Alan II is that: "Agent agrees to devote reasonable time and attention providing sales management consulting services to Client."  The agreement was signed by
(continued...)

1  Defendants or the Rodrigues Defendants.  In the face of defendants' silence, this evidence establishes

2  the first element, that of influence and control.

3  The same evidence, and the same silence, also permits the court to infer that the second

4  element has been met: that of inseparability of the Coolidge Defendants and the Rodrigues Defendants

5  from, respectively, Coolidge and Rodrigues.  According to the evidence, the Coolidge Defendants and

6  Rodrigues Defendants did nothing without Coolidge and Rodrigues, and the transfers to those entities

7  from NADN were authorized and directed by Coolidge and Rodrigues.

8  That leaves the last element: that adherence to the corporate fiction would sanction fraud

9  or promote injustice.  With respect to the avoidance of sanctioning a fraud or injustice, the Nevada

10  Supreme Court has said that "'[i]t is not necessary that the plaintiff prove actual fraud. It is enough if

11  the recognition of the two entities as separate would result in an injustice.'" *McCleary Cattle Co.*, 73

12  Nev. at 282, 317 P.2d at 959, *quoting* Gordon v. Aztec Brewing Co., 33 Cal.2d 514, 522, 203 P.2d 522,

13  527 (1949). Not much more was said on this ground, the court relying on citation to several other

14  California cases for its analysis.

15  These cases, however, are illuminating here.  In particular, the court cited Wilson v.

16  Stearns, 123 Cal. App. 2d 472, 486, 267 P.2d 59, 69 (1954), which stated the test was met when "it

17  appears that a corporation is being used merely as an instrumentality through which an individual who

18  is the owner of its capital stock transacts his business, and where an inequitable result would ensue,

19  the two should be considered as one, . . . . The injustice here manifest is that to recognize respondent

20  George Stearns and Alamo Development Co., Inc., as two separate and distinct entities would permit

21  the former to avoid his liability on a contract through use of the corporate fiction for that purpose."

22

23  [24](...continued)

24  Rodrigues for Alan II, and there was no evidence that anyone other than Rodrigues was associated with Alan II.

25

30

1    *See also* Grant v. United States Elec. Corp., 125 Cal. App. 2d 193, 270 P.2d 64 (1954) (injustice found

2    when sole owner of corporation induced extension of credit on basis of owner's financial worth, and

3    then attempted to evade liability by interposing corporation as debtor; evidence also tended to show

4    that owner never intended to perform, or cause corporation to perform, on promise made).

5            In *Giampietro*, this court explored Nevada law with respect to alter ego when no fraudulent

6    scheme as to the debtor's creditors was present, and found that the essence of the Nevada case law on

7    "injustice" looked to "the justifiable reliance of consensual creditors, and the reasonable expectations

8    of non-consensual creditors . . . ." 317 B.R. at 856.  Here, however, the defendants have each engaged

9    in transactions with the actual intent to hinder, delay or defraud creditors.  Under these facts, the

10   teachings of *Wilson* and *Grant* – the cases relied upon by the Nevada Supreme Court – are more

11   applicable.  As those cases indicate, regardless of a party's reliance or expectations, if a transferor

12   engages in a fraudulent scheme through the use of corporations that party controls, the liability of the

13   corporate pawns for that scheme will be visited upon the controlling individual.  *Frank McCleary*

14   *Cattle Co.,* 73 Nev. at 282, 317 P.2d at 959; *see also Cuthill*, 275 at 651-52.

15           In the context of this case, Coolidge and Rodrigues could not require NADN to transfer

16   funds to the Coolidge Defendants and the Rodrigues Defendants, with the intent and expectation that

17   Coolidge and Rodrigues would benefit, without also becoming co-liable as an alter ego for those

18   transfers.  Practically put, once having established that all of the defendants engaged in a concerted

19   scheme of fraudulent transfers, the Trustee need not guess where the fruits of that fraud landed, and

20   can sue all or any of the defendants for the aggregate liability.

21           B.      *Reverse Veil-Piercing: Making the Coolidge Defendants Liable for the Transfers*

22                   *to Coolidge and the Rodrigues Defendants Liable for the Transfers to Rodrigues*

23           Reverse veil-piercing is a process by which a subsidiary can be made to bear the obligations

24   of its parent; here, that would mean that the owner of the equity interest in the various corporations

25

31

1  would be co-liable with the corporations themselves.  The Nevada Supreme Court recently approved

2  reverse veil-piercing in LFC Mktg. Group, Inc. v. Loomis, 116 Nev. 896, 8 P.3d 841 (Nev. 2000), in

3  which the court stated the test for reverse veil-piercing as follows:

4  > The elements for finding an alter ego, which must be established by a

5  > preponderance of the evidence, are:  (1) the corporation must be influenced and

6  > governed by the person asserted to be the alter ego; (2) there must be such unity

7  > of interest and ownership that one is inseparable from the other; and (3) the

8  > facts must be such that adherence to the corporate fiction of a separate entity

9  > would,  under the circumstances, sanction [a] fraud or promote injustice.

10  *Id.* at 904, 8 P.3d at 846-47.

11  This test follows Nevada law for regular veil-piercing as set forth in Frank McCleary Cattle

12  Co. v. Sewell, 73 Nev. 279, 317 P.2d 957 (Nev. 1957), and as discussed above.  As with the earlier

13  analysis, much the same evidence that established the propriety of normal veil-piercing also

14  established the Trustee's case for reverse veil-piercing here.  There was the necessary influence shown

15  by the testimony that none of the non-human defendants did anything without the intervention of

16  Coolidge or Rodrigues, as the case may be.  In addition, the Trustee established  a unity of interest

17  between the various defendants (Rodrigues and the Rodrigues Defendants on one hand; Coolidge and

18  the Coolidge Defendants on the other) through the demonstration of 100% ownership of the non-

19  human defendants and their joint purpose.  Finally, as indicated above, the non-human defendants were

20  instrumentalities of the scheme perpetrated by Coolidge and Rodrigues, and for the same reason as

21  stated above, it would promote injustice and fraud to not hold the Coolidge Defendants and the

22  Rodrigues Defendants liable for the debts of their owners.

23  **V.        Conclusion**

24  The Trustee has introduced sufficient evidence to show that all of the transfers identified

25

1   were made with the actual intent to hinder, delay or defraud creditors as required by both state and

2   federal law.  Further, the Trustee has shown that none of the defendants took the transfers in good

3   faith.  Finally, the Trustee has made, under Nevada law, a sufficient showing that Coolidge should be

4   liable for the transfers made to the Coolidge defendants, and vice versa, and that Rodrigues should be

5   liable for the transfers made to the Rodrigues defendants, and vice versa.

6          This memorandum constitutes the court's findings of fact and conclusions of law in

7   accordance with FED. R. BANKR. P. 7052.  A separate judgment shall be entered in accordance with

8   FED. R. BANKR. P. 9021.  Costs shall be awarded to the plaintiff Trustee under FED. R. BANKR. P.

9   7054(a).

10  Copies sent to:

11  William A. Leonard, biff7tte@mindspring.com

12  Barton L. Jacka, Esq.; jacka@shlaw.com; mcallister@shlaw.com; hill@shlaw.com;
    hawkins@shlaw.com; przybylek@shlaw.com;

13
    Darrell Lincoln Clark
14  438 E. Sahara Avenue
    Las Vegas, NV 89104
15
                                        # # #
16

17

18

19

20

21

22

23

24

25
                                        33